Hillsborough-northern judicial district
No. 2012-338

CITY OF MANCHESTER *& a.*

v.

SECRETARY OF STATE

Argued: June 6, 2012
Opinion Issued: June 19, 2012

690

692

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Thomas J. Donovan* on the brief and orally), for petitioners City of Manchester, Barbara E. Shaw, and John R. Rist.

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Martin P. Honigberg* and *Jay Surdukowski* on the brief, and *Mr. Honigberg* orally), for petitioners Mary Jane Wallner, Harold V. Lynde, Jr., Thomas Katsiantonis, Jean Sanders, Kathryn Miller, Patricia Martin, Joe Cicirelli, William Butynuski, Ph.D., William Donovan, Ginny Schneider, Michael Marsh, Peg Fargo, Joy K. Tilton, Roland Hofemann, Suzanne Gottling, Joseph Jesseman, Ron Geoffrey, Sr., Margaret Small-Porter, Brian T. Stern, Robyn St. Pierre, Jillian Dubois, Sinda Ullstrup, and Charles Townsend.

*City Solicitor's Office*, of Concord (*James Kennedy* and *Danielle L. Pacik* on the brief), for petitioner City of Concord.

*The MuniLaw Group*, of Epsom (*Jason B. Dennis* and *Tony F. Soltani* on the brief), for petitioners Marshall Lee Quandt, Tony F. Soltani,

Matthew Quandt, Leo Pepino, Julie Brown, Steve Vaillancourt, Irene Messier, James Pilliod, M.D., James MacKay, Ph.D., Mary Ellen Moran-Siudut, M.S., David Pierce, Peter Leishman, Nicholas J. Lavasseur, Shaun Doherty, and Peter Schmidt.

*Wescott, Dyer, Fitzgerald & Nichols, P.A.*, of Laconia (*Peter V. Millham* and *Matthew D. Huot* on the brief), for petitioners Town of Gilford, Peter V. Millham, and Leo B. Sanfacon.

*Michael A. Delaney*, attorney general (*Anne M. Edwards*, associate attorney general, and *Stephen G. LaBonte*, assistant attorney general, on the brief), for the attorney general.

*Nixon Peabody LLP*, of Manchester (*David A. Vicinanzo* and *Anthony J. Galdieri* on the brief, and *Mr. Vicinanzo* orally), for the intervenor, the New Hampshire House of Representatives, through its Speaker.

*J. Miller & Associates, PLLC*, of Concord (*Christopher C. Buck* on the brief), *Allan B. Krans, Sr.*, of Dover, by brief, and *Philip T. McLaughlin*, of Laconia, by brief, for the City of Dover and Town of Meredith, as *amici curiae*.

PER CURIAM. These consolidated cases are before us on interlocutory transfer without ruling from the Superior Court (*Brown*, J.). *See* SUP. CT. R. 9. The petitioners, New Hampshire voters and the towns and municipalities in which some of them live, seek a declaration that Laws 2012, chapter 9, the law redistricting the New Hampshire House of Representatives (the Plan), violates the State Constitution. We conclude that such a declaration is unwarranted.

*I. Background*

The Plan redistricts the House based upon the 2010 census. It was passed by the House on January 18, 2012, and by the Senate on March 7, 2012. Appendix A to this opinion is a chart setting forth the Plan, which the court compiled from evidence in the record on appeal.

According to its statement of intent, the Plan represents "the culmination of months of research, public input, and discussion concerning how to appropriately apportion New Hampshire House seats [under] . . . the 2010 census while complying with federal and state constitutional requirements." Although the Governor vetoed the legislation, the legislature overrode his veto on March 28, 2012. Consistent with Part II, Article 9 of the State Constitution, the Plan sets the size of the House at 400 members. These representatives are divided among 204 legislative districts. Of these districts, ninety-one are single-town districts and seventy are multi-town

districts. The remaining forty-three districts are "floterial" districts. A floterial district is a district that "floats above" several distinct single- or multi-member districts. *Burling v. Speaker of the House*, 148 N.H. 143, 150 (2002) (quotation omitted). In a single-member district, one representative is elected by the district's voters; in a multi-member district, voters elect more than one representative. *Id.*

This is not the first redistricting dispute we have been required to decide. In 2002, we were called upon to establish new district plans for both the House and Senate. *See Below v. Secretary of State*, 148 N.H. 1 (2002); *Burling*, 148 N.H. 143. "This task fell to the court because . . . the New Hampshire legislature was unsuccessful in its efforts to reapportion the house and senate during the session following the 2000 census." *Petition of Below*, 151 N.H. 135, 136 (2004). "We did so reluctantly because we understood that redistricting is an inherently political process." *Id.* "Unlike the legislature, courts have no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name." *Id.* (quotation omitted); *see Connor v. Finch*, 431 U.S. 407, 414-15 (1977).

Two years later, in 2004, the legislature amended the court's plan. *Petition of Below*, 151 N.H. at 137. We were then asked whether the legislature had the authority to amend the court's redistricting plan, and we concluded that it did. *Id.* In 2008, we were asked whether a 2006 amendment to Part II, Article 11 of the State Constitution mandated that the House be redistricted before the next decennial census. *Town of Canaan v. Sec'y of State*, 157 N.H. 795, 799-800 (2008). The amendment, Constitutional Amendment Concurrent Resolution 41 (CACR 41), was likely a response to the redistricting plan we created in *Burling*, *id.* at 797, which included numerous large multi-member at-large districts, but did not include "floterial" districts. *Burling*, 148 N.H. at 157, 159. We ruled that CACR 41 did not compel immediate reapportionment. *Sec'y of State*, 157 N.H. at 799-800.

As amended in 2006, Part II, Article 11 of the State Constitution now reads:

> When the population of any town or ward, according to the last federal census, is within a reasonable deviation from the ideal population for one or more representative seats the town or ward shall have its own district of one or more representative seats. The apportionment shall not deny any other town or ward membership in one non-floterial representative district. When any town, ward, or unincorporated place has fewer than the number of inhabitants necessary to entitle it to one representative, the legislature shall form those towns, wards, or unincorporated places into representative districts which contain a sufficient number of inhabitants to

entitle each district so formed to one or more representatives for the entire district. In forming the districts, the boundaries of towns, wards, and unincorporated places shall be preserved and contiguous. The excess number of inhabitants of a district may be added to the excess number of inhabitants of other districts to form at-large or floterial districts conforming to acceptable deviations. The legislature shall form the representative districts at the regular session following every decennial federal census.

N.H. CONST. pt. II, art. 11. In the instant case, we have been asked to decide whether the Plan violates Part II, Article 11, as amended in 2006, because it: (1) fails to provide approximately sixty-two towns, wards, and places with their own representatives; (2) divides certain cities, towns, and wards; and (3) devises multi-member districts comprised of towns, wards, and places that are not contiguous. We have also been asked whether the Plan is unconstitutional because it does not take into account "community of interest" factors. Although some of the petitioners purport to raise claims under the Federal Constitution, their federal constitutional arguments are not sufficiently developed to warrant our review. Because the petitioners have articulated claims only under the State Constitution, to the extent that we rely upon federal law, we do so solely to aid our analysis. *See State v. Ball*, 124 N.H. 226, 233 (1983).

*II. Standard of Review*

■ We first address the standard by which we review the Plan. As with any statute, we must presume that the Plan is constitutional, and we will not declare it invalid "except upon inescapable grounds." *New Hampshire Health Care Assoc. v. Governor*, 161 N.H. 378, 385 (2011) (quotation omitted). This means that "we will not hold [the] statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." *Id.* (quotation omitted). "It also means that when doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality." *Id.* (quotation and brackets omitted).

■ Courts generally defer to legislative enactments not only because they represent "the duly enacted and carefully considered decision of a coequal and representative branch of our Government," *Walters v. Nat. Assn. of Radiation Survivors*, 473 U.S. 305, 319 (1985), but also because the legislature "is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 195-96 (1997) (quotations omitted).

■ This is particularly so in the redistricting context. "Our State Constitution vests the authority to redistrict with the legislative branch, and for good reason." *Petition of Below*, 151 N.H. at 150. "A state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality." *Id.* (quotation and brackets omitted); *Connor*, 431 U.S. at 414-15. "[I]t is primarily the Legislature, not this Court, that must make the necessary compromises to effectuate state constitutional goals and statutory policies within the limitations imposed by federal law." *In re Town of Woodbury*, 861 A.2d 1117, 1120 (Vt. 2004) (quotation omitted).

Therefore, "we tread lightly in this political arena, lest we materially impair the legislature's redistricting power." *Petition of Below*, 151 N.H. at 150. "[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to . . . constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds v. Sims*, 377 U.S. 533, 586 (1964) (brackets omitted). "Both the complexity in delineating state legislative district boundaries and the political nature of such endeavors necessarily preempt judicial intervention in the absence of a clear, direct, irrefutable constitutional violation." *State ex rel. Cooper v. Tennant*, Nos. 11-1405, 11-1447, 11-1516, 11-1517, 11-1525, 2012 WL 517520 (W. Va. Feb. 13, 2012).

Some of the petitioners argue, unpersuasively, that because, in their view, the Plan is unconstitutional, it is not entitled to a presumption of constitutionality. This assertion has no support in our jurisprudence. If the presumption of constitutionality could be overcome merely by challenging a statute, the presumption would be rendered meaningless.

■ To the extent that these petitioners rely upon *Holt v. 2011 Reapportionment Commission*, Nos. 7 MM 2012, 1 WM 2012, 2 MM 2012, 3 MM 2012, 4 MM 2012, 5 MM 2012, 6 MM 2012, 8 MM 2012, 9 MM 2012, 10 MM 2012, 17 MM 2012, 4 WM 2012, 2012 WL 375298, at *17 (Pa Feb. 3, 2012), for this proposition, their reliance is misplaced. The redistricting plan at issue in *Holt* was not enacted by the legislature as a whole, but was created by a commission "composed of four leaders of the [Pennsylvania] General Assembly." *Id.* at *16. Because the plan was not a legislative enactment, the Pennsylvania Supreme Court ruled that it was not entitled to the same presumption of constitutionality that is accorded to statutes. *Id.* at *17. Here, by contrast, the Plan is a statute, and is entitled to the same presumption of constitutionality as any other statute. *See Arizona Coalition v. Redistricting Com'n*, 208 P.3d 676, 684 (Ariz. 2009) ("A redistricting plan receives the same deference as we afford to other legislation.").

*III. Burden of Proof*

■ Because any statute passed by the legislature is presumed constitutional, the party challenging it bears the burden of proof. *See New Hampshire Health Care Assoc.*, 161 N.H. at 385. "Most challenges to redistricting plans question whether a plan violates the Equal Protection Clause." *Arizona Coalition*, 208 P.3d at 684-85; *see* U.S. CONST. amend. XIV. "Whether asserting vote dilution or racial gerrymandering, these equal protection claims generally involve the alleged deprivation of fundamental rights." *Arizona Coalition*, 208 P.3d at 685 (citations omitted). When reviewing such claims, courts "apply an elevated level of judicial scrutiny." *Id.*

■ The petitioners in this case, however, do not allege an equal protection violation. Rather, they contend that the Plan violates other state constitutional mandates to which we apply a standard of review akin to the well-established rational basis standard. To prevail, the petitioners must establish that the Plan was enacted "without a rational or legitimate basis." *Parella v. Montalbano*, 899 A.2d 1226, 1232 (R.I. 2006) (quotation omitted); *see In re Town of Woodbury*, 861 A.2d at 1120 ("If a plan is consistent with the fundamental constitutional requirement that districts be drawn to afford equality of representation, we will return it to the Legislature only when there is no rational or legitimate basis for any deviations from other constitutional or statutory criteria." (quotation omitted)). Moreover, "[w]e will not reject a redistricting plan simply because the petitioners have devised one that appears to satisfy constitutional and statutory requirements to a greater degree than the plan approved by the Legislature." *In re Reapportionment of Town of Hartland*, 624 A.2d 323, 327 (Vt. 1993); *see Gaffney v. Cummings*, 412 U.S. 735, 750-51 (1973) (redistricting plan is not unconstitutional simply because some "resourceful mind" has come up with a better one). Although proof of such a plan "may cast doubt on the legality of the Legislature's plan[,] [t]he petitioners' burden . . . is not to establish that some other preferable plan exists, but to demonstrate the absence of a rational or legitimate basis for the challenged plan's failure to satisfy constitutional or statutory criteria." *In re Reapportionment of Town of Hartland*, 624 A.2d at 327 (citation omitted). In reviewing the petitioners' arguments, "we must consider not only the specific violations claimed, but also those claims within the context of the entire plan, keeping in mind the difficulties in satisfying the various legal requirements statewide." *Id.* The burden at all times rests with the petitioners to establish that the legislature acted without a rational basis in enacting the Plan. *See Parella*, 899 A.2d at 1232-33.

*IV. Governing Principles*

■ The "overriding objective" of any legislatively-adopted redistricting plan for a state legislature "must be substantial equality of population among the various [legislative] districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds*, 377 U.S. at 579. This principle is often referred to as the one person/one vote standard. *See Burling*, 148 N.H. at 146-47. With respect to the House, the primacy of this principle is secured by both the Equal Protection Clause of the Federal Constitution, U.S. CONST. amend. XIV, and Part II, Article 9 of the State Constitution. *See id.* Part II, Article 9, as amended in 1964, requires that the House be "founded on principles of equality" and that representation in the House "be as equal as circumstances will admit." N.H. CONST. pt. II, art. 9. In *Burling*, we held that this provision was at least as protective of a citizen's right to vote as the federal constitutional standard of one person/one vote. *Burling*, 148 N.H. at 149.

■ The established method to determine whether a redistricting plan affords citizens an equal right to vote is to calculate the extent to which it deviates from the ideal district population. *Id.* at 152; *see New York City Bd. of Estimate v. Morris*, 489 U.S. 688, 700, 700-01 n.7 (1989). The first step is to determine the ideal population. *Burling*, 148 N.H. at 152. To calculate the ideal population of a single-member district, the state population is divided by the total number of state representatives. *Id.* at 152-53. In New Hampshire, assuming that the House contains 400 members, the ideal population for a single-member district is 3,291 (1,316,470 people divided by 400 representatives). The ideal population for a multi-member district is expressed as a multiple of the ideal population for a single-member district. *Id.* Thus, in New Hampshire, the ideal population for a district with three representatives, for example, is 3,291 multiplied by 3, or 9,873.

■ Once the ideal population is calculated, it is then possible to determine the extent to which a given district population deviates from the ideal. *Id.* Relative deviation is the most commonly used measure and is derived by dividing the difference between the district's population and the ideal population by the ideal population. *Id.*

For example, the relative deviation for a single-member district in New Hampshire with a population of 4,000 is calculated by subtracting 3,291 from 4,000 and dividing the difference (+709) by 3,291. *See id.* The relative deviation is +21.54%. *See id.* For a multi-member district, the relative deviation is calculated using the "aggregate method," which aggregates the total number of representatives and the total population in the district to calculate deviation. *Id.* Thus, for a district with a population of 8,000 and

three representatives, the difference between 8,000 and 9,873 (3 x 3,291) — that is, -1,873 — is divided by 9,873, resulting in a relative deviation of -18.97%. *See id.*

██ Using the relative deviation, one can calculate the overall range of deviation for a state-wide plan by adding the largest positive deviation in the state and the largest negative deviation in the state without regard to algebraic sign. *Id.*; *see Abrams v. Johnson*, 521 U.S. 74, 98 (1997). Thus, in the example above, +21.54% and -18.97% yields an overall range of deviation of 40.51%. *See Burling*, 148 N.H. at 153.

██ Calculating the relative deviation of floterial districts requires using another method to calculate deviation — the component method. *See id.* at 163 (Appendix C, setting forth component method formula). In *Burling*, we explained that although the aggregate method is proper for multi-member districts, it is not proper for floterial districts because it masks substantial deviation from the one person/one vote principle, and produces artificially low deviation percentages. *Id.* at 154-55. In *Burling*, we offered the following example:

> [I]n the plan submitted by the house, the towns of Epping (population 5,476) and Fremont (population 3,510) are combined in a floterial with one representative. Each town also constitutes a single-member district and thus each town has its own representative. The plan calculates the deviation as if all three representatives represent both towns together (-3.03%). In fact, each town is represented by one representative as well as a floterial representative.

*Id.* at 154. Thus, we observed that using the aggregate method of calculating deviation in this circumstance was misleading because it treated the two towns and the floterial district as if they comprised a single, three-representative district when this was not the case. *Id.* By contrast, if the component method were used to calculate deviation in the above example, the deviation for each town would be measured individually and would include that town's share of the floterial representative; there would not be a separate calculation for the floterial district as a whole. *See id.* at 163.

██ ██ Redistricting of a state legislature is "not subject to the same strict [equal representation] standards applicable to reapportionment of congressional seats." *White v. Regester*, 412 U.S. 755, 763 (1973). With congressional redistricting, "absolute population equality [is] the paramount objective." *Karcher v. Daggett*, 462 U.S. 725, 732-33 (1983). By contrast, with state legislative redistricting, "the overriding objective

[is] . . . substantial equality of population among the various districts." *Reynolds*, 377 U.S. at 579. Accordingly, "[m]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993) (quotation omitted). "[A]s a general matter, . . . an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." *Id.* (quotation omitted). Such a plan is presumptively constitutional. *Cecere v. County of Nassau*, 274 F. Supp. 2d 308, 311 (E.D.N.Y. 2003). This presumption is rebuttable. *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996). To prevail, a challenger may not rely upon the overall deviation range alone, but must "produce further evidence to show that the apportionment process had a taint of arbitrariness or discrimination." *Id.* (quotation omitted); *see Roman v. Sincock*, 377 U.S. 695, 710 (1964).

"A plan with larger disparities in population . . . creates a prima facie case of discrimination and therefore must be justified by the State." *Voinovich*, 507 U.S. at 161 (quotation omitted). If the challenger to such a plan demonstrates that the population differences could have been avoided, the State then bears the burden of justifying those differences. *See Karcher*, 462 U.S. at 731 (congressional redistricting); *Reynolds*, 377 U.S. at 579 ("So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature."). In a congressional redistricting case, the State has the burden of "proving that each significant variance between districts was necessary to achieve some legitimate goal." *Karcher*, 462 U.S. at 731.

In the instant case, the parties agree that the overall range of deviation for the Plan is 9.9%. *See* Appendix A. The Plan's deviation range was derived by adding the deviations of the highest relative positive deviation (+5.0%) and the highest relative negative deviation (-4.9%). *See id.* The parties agree that deviations were calculated by using the traditional method to calculate the deviations of single-member and multi-member districts and using the component method to calculate deviations in the floterial districts.

The petitioners do *not* argue that this range of deviation violates either Part II, Article 9 of the State Constitution or the Federal Equal Protection Clause. In other words, they do not contend that the Plan's 9.9% range of deviation violates the principle of one person/one vote. Nor could they so argue under the circumstances of this case. The petitioners' primary

argument is that the legislature erred by adhering too stringently to this principle instead of affording more towns, wards, and places their own representatives and that in doing so, the legislature violated Part II, Article 11 of the State Constitution.

*V. Petitioners' Claims*

*A. Part II, Article 11: Affording Towns, Wards, and Places Their Own Districts*

The petitioners fault the legislature for adopting a plan with an overall range of deviation under 10%. They argue that the legislature could have adopted a plan with a higher range of deviation that afforded more towns, wards, and places their own representatives and, thus, could have complied more fully with Part II, Article 11 while also complying with the Federal Constitution.

The petitioners concede that perfect compliance with the Federal Constitution and Part II, Article 11 is *impossible*; that is, they admit that the legislature could not have adopted a plan with an overall deviation of under 10% in which every town, ward or place having a population "within a reasonable deviation from the ideal population" has its own district. N.H. CONST. pt. II, art. 11. Moreover, they do not argue that the legislature could have given more towns, wards, and places their own districts while still maintaining a deviation range of under 10%. The thrust of their argument is that the legislature needlessly adhered to the 10% rule. Had the legislature only relaxed this rule, the petitioners assert, it could have given more towns, wards, and places their own representatives.

These assertions fail. The petitioners have not shown that the legislature lacked a rational or legitimate basis for adhering to the 10% rule. "The federal equal protection standards, while not mandating any precise methodology to be utilized by the states in redistricting plans, have articulated one ineluctable prerequisite: where a state legislative redistricting plan results in less than 10% deviation in district populations from the ideal, the plan is not *per se* violative of the principle of equal representation." *Tennant*, 2012 WL 517520. Such a plan does not "make out a prima facie case of invidious discrimination under the Fourteenth Amendment," while a plan with a maximum population deviation of more than 10% "creates a prima facie case of discrimination." *Voinovich*, 507 U.S. at 161 (quotations omitted).

Given this precedent, adhering to the 10% rule is, undoubtedly, a rational legislative policy. We have not found any case in which a court has

*required* a legislature to adopt a redistricting plan with an overall deviation range of more than 10% in order to enhance its compliance with a state constitutional mandate.

Nor can we fault the legislature for giving primacy to the principle of one person/one vote. The Supreme Court has held that population equality must be the predominant factor in redistricting plans. *See Reynolds*, 377 U.S. at 581; *cf. Below*, 148 N.H. at 9 (decided in context of court's role in redistricting). "[S]ubstantial equality of population" is the "overriding objective" of a state legislative redistricting plan. *Reynolds*, 377 U.S. at 579. Although minor population deviations may be justified as a means of providing political subdivisions representation as political subdivisions, the Court has cautioned that if as a result of this "clearly rational state policy . . . population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." *Id.* at 581.

To the extent that the petitioners suggest that in giving primacy to the one person/one vote principle, the legislature favored federal over state constitutional principles, they are mistaken. This principle is enshrined not only in the Federal Constitution but also in Part II, Article 9 of our State Constitution. One person/one vote is as much a state as it is a federal constitutional principle. *See Burling*, 148 N.H. at 146.

Further, even if the legislature had favored federal over state constitutional principles, that would not have been error. "There is a hierarchy of applicable law governing the development of a plan for apportioning the legislature." *Twin Falls County v. Idaho Com'n*, 271 P.3d 1202, 1204 (Idaho 2012). "The United States Constitution is the paramount authority." *Id.*

None of the petitioners' plans persuades us that the Plan lacks a rational or legitimate basis. The petitioners rely primarily upon a plan they say has an overall deviation range of 14%, and which also gives twenty-four additional towns, wards, and places their own representatives. The petitioners contend that this plan demonstrates that the legislature could have adopted a plan with a somewhat higher overall deviation that gives more towns, wards, and places their own representatives. Doing so, the petitioners argue, would have represented a better accommodation of all pertinent federal and state constitutional requirements.

We reject the petitioners' assumption that a plan with an overall population deviation range of 14% necessarily complies with the Federal and State Constitutions. Such a plan has been deemed "presumptively

*unconstitutional"* under the Equal Protection Clause, *Bingham Cty v. Idaho Com'n for Reapportionment,* 55 P.3d 863, 865 (Idaho 2002) (emphasis added), and courts have invalidated plans with similar deviation ranges. *See, e.g., Rural W. Tenn. African-American Affairs Coun. v. McWherter,* 836 F. Supp. 447, 450-52 (W.D. Tenn. 1993) (state legislative redistricting plan with 13.9% range of deviation violated one person/one vote principle), *aff'd without opinion,* 510 U.S. 1160 (1994).

Moreover, we observe that although the petitioners argue that this alternative plan has a deviation of 14%, the intervenor, the House, through its Speaker, contends that this figure is illusory because the petitioners did not correctly calculate the deviations in the floterial districts. The petitioners argue that they used the component method to derive the deviation in the floterial districts; the intervenor argues that the petitioners' calculations are incorrect. As the record does not include the parties' calculations, we cannot resolve this factual dispute on appeal.

However, even if we assume that the petitioners' 14% figure is correct, this plan nonetheless fails to meet their burden of proving that the legislature's plan lacks a legitimate or rational basis. The legislature had a choice to make: adhere to the 10% rule and give fewer towns, wards, and places their own districts or exceed the 10% rule and give more towns, wards, and places their own districts. This is a policy decision reserved to the legislature. *See Bonneville County v. Ysursa,* 129 P.3d 1213, 1221 (Idaho 2005). "We simply cannot micromanage all the difficult steps the [legislature] must take in performing the high-wire act that is legislative district drawing." *Id.* "[O]ur preference for deferring to the [legislature] compels us to resolve [this] issue in its favor." *Id.*

The petitioners' other plans also fail to demonstrate that the Plan lacks a rational or legitimate basis. For instance, petitioner Town of Gilford and two of its residents, Peter V. Millham and Leo B. Sanfacon (collectively, the Gilford petitioners), propose a plan under which Gilford and Meredith are no longer combined in a district, but instead each is given its own district. The Gilford petitioners admit that this plan would produce an overall range of deviation of 13.44%. This plan fails to persuade us that the legislature had no rational or legitimate basis for combining Gilford and Meredith in one district.

Similarly, petitioner City of Concord (Concord) proposes an alternative plan under which Concord Ward 5 and the Town of Hopkinton would each have its own district and the excess population of each would be combined in a floterial district. Using the component method to calculate deviation, Concord asserts that "the relative deviation is 20%." In another alternative plan, which would entail assigning Concord Ward 5 to its own district and combining either Concord Ward 1 or Concord Ward 3 with the Town of

Hopkinton in a floterial district, the overall range of deviation would be either 12.7% or 16%. None of these proposals convinces us that the legislature lacked a rational or legitimate basis for combining Concord Ward 5 and the Town of Hopkinton in a single district.

Petitioner City of Manchester and two of its residents, Barbara E. Shaw and John R. Rist (collectively, the Manchester petitioners), propose a plan under which Manchester would have thirty-three or thirty-four seats ("two seats for each [of twelve] ward[s], plus nine or ten seats arranged in three or four floterial[s]") instead of the thirty-three seats currently allotted to Manchester under the Plan ("31 [seats] . . . and two more . . . shared in a floterial district with Litchfield"). The Manchester petitioners contend that such a plan somehow would have complied more fully with Part II, Article 11. In the absence of developed argument, we are unpersuaded that this is the case.

Another proposed plan suggested by several petitioners relies upon a method of weighted voting in floterial districts. As the intervenor aptly notes, "[s]ubstantial doubt exists regarding whether a system of weighting votes is constitutional." *See New York City Bd. of Estimate*, 489 U.S. at 697-98 (rejecting one method for weighing votes as "an unrealistic approach [for] determining whether citizens have an equal voice in electing their representatives"); *Reynolds*, 377 U.S. at 563 ("Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable.").

Yet another plan proposes to create 400 single-member districts. As the petitioners concede, however, this plan violates Part II, Article 11's command that, in forming districts, "the boundaries of towns, wards and unincorporated places shall be preserved and contiguous." Other plans deprive one town, ward or place of its own district in order to allow another town, ward or place to have its own district. These proposed plans fail to persuade us that the legislature's plan is unconstitutional. To the extent that the petitioners at oral argument referred to plans that are not in the appellate record, we decline to consider them.

Also at oral argument, the petitioners suggested that the court had all of the information required to create its *own* redistricting plan, which would comply more fully with the State and Federal Constitutions than does the Plan. This is not our role in this appeal. "Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted." *Jensen v. Kentucky State Bd. of Elections*, 959 S.W.2d 771, 776 (Ky. 1997); *Tennant*, 2012 WL 517520.

Because of the petitioners' failure of proof, their reliance upon *Holt*, 2012 WL 375298, is misplaced. In *Holt*, the challengers argued that the plan adopted by the Pennsylvania Legislative Reapportionment Commission (LRC) violated the state "constitutional ban on dividing counties, municipalities, and wards 'unless absolutely necessary.'" *Holt*, 2012 WL 375298, at *8. In ruling the LRC plan unconstitutional, the court "focus[ed] primarily on the evidence represented by [the challengers'] alternative plan" and found that this plan "show[ed] that a redistricting map could readily be fashioned which maintained a roughly equivalent level of population deviation . . . as the Final Plan, while [splitting] significantly fewer political subdivisions." *Id.* at *35.

By contrast, in this case, none of the plans the petitioners propose "maintain[ ] a roughly equivalent level of population deviation" as does the Plan.

The petitioners' reliance upon *Idaho Commission*, 271 P.3d at 1207, is equally unavailing. In that case, the court, reviewing a redistricting plan adopted by a redistricting commission, ruled that although the plan complied with the Federal Constitution because its overall range of deviation was under 10%, it violated the State Constitution because it divided more counties than were necessary to achieve this deviation. *Idaho Com'n*, 271 P.3d at 1206. The court noted that the commission had rejected other plans that divided fewer counties, but still complied with the 10% deviation rule. *Id.*

Here, the petitioners have not presented evidence that any of their plans have an overall deviation range of under 10%.

■ Ultimately, Part II, Article 11 "cannot be considered in isolation." *Beaubien v. Ryan*, 762 N.E.2d 501, 506 (Ill. 2001). Part II, Article 11 sets forth only some of several constitutional criteria that a redistricting plan must satisfy. *See id.* In addition to the overarching criterion of population equality, the redistricting plan must be based upon the last federal decennial census; there may be no fewer than 375 and no more than 400 representatives; no town, ward, or place may be divided unless it requests to be divided by referendum; and the boundaries of towns, wards, and places must be preserved and contiguous. N.H. CONST. pt. II, arts. 9, 11, 11-a. As the petitioners conceded at oral argument, perfect compliance with all of these mandates is impossible. "Redistricting is a difficult and often contentious process. A balance must be drawn. Trade-offs must be made." *Beaubien*, 762 N.E.2d at 507. The petitioners have failed to persuade us that the "[t]rade-offs" the legislature made in enacting the Plan were unreasonable. *Id.*

*B. Part II, Article 11: Preserving Boundaries and Contiguity*

Petitioners Marshall Lee Quandt, Tony F. Soltani, Matthew Quandt, Leo Pepino, Julie Brown, Steve Vaillancourt, Irene Messier, James Pilliod, M.D., James MacKay, Ph.D., Mary Ellen Moran-Siudut, M.S., David Pierce, Peter Leishman, Nicholas J. Lavasseur, Shaun Doherty, and Peter Schmidt (the Quandt petitioners) argue that the Plan also violates Part II, Article 11's mandate that "[i]n forming districts, the boundaries of towns, wards, and unincorporated places shall be preserved and contiguous." The Quandt petitioners assert that it is undisputed that the Plan "breaks up" certain cities, towns, and wards, and that it devises multi-member districts with no land borders (in other words, which are not contiguous).

We do not share their view of the undisputed facts. The record submitted on appeal does not demonstrate that the Plan "breaks up" *any* town, ward or place that did not previously request by referendum to be divided. *See* N.H. CONST. pt. II, art. 11-a. Further, the only multi-member district comprised of locations that do not share a land border to which the Quandt petitioners refer is the district comprising Gilford and Meredith. Because none of the Quandt petitioners reside in Gilford or Meredith, none has standing to raise this claim. Although the Gilford petitioners have standing to raise this claim, they do not do so. The Gilford petitioners note that Meredith and Gilford "share a border on the map," which "runs through Lake Winnipesaukee," but do not argue that, because of this fact, combining Gilford and Meredith in a district violates the contiguity requirement.

*C. Community of Interest Factors*

The Manchester petitioners contend that the Plan is unconstitutional because it does not reflect "community of interest" factors. They define a "community of interest" as "a group of people concentrated in a geographic area who share similar interests and priorities — whether social, cultural, ethnic, economic, religious, or political." (Quotation omitted.) Although they acknowledge that the State Constitution contains "proxies for community of interest," such as its requirement that districts contain contiguous towns, wards, and places and that the boundaries of towns, wards, and places be preserved, they do not contend that the Plan violates these proxies. Rather, the Manchester petitioners argue there is an additional "inherent constitutional redistricting criterion," which requires redistricting plans to take communities of interest into account. The Plan does not comply with this criterion, they argue, because, in addition to giving each its own district, the Plan combines Manchester Wards 8 and 9 in a floterial district with

Litchfield. This floterial, they contend, is "unnecessary" and "unconstitutional" because Manchester, as a whole, does not share a community of interest with Litchfield.

 The Supreme Court has held that preserving communities of interest is a "traditional race-neutral districting principle[ ]," along with compactness and respect for political subdivisions, among others. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). The Court has made clear, however, that these factors "are important not because they are constitutionally required — they are not — but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (citation omitted).

 Nothing in the New Hampshire Constitution requires a redistricting plan to consider "communities of interest" as the Manchester petitioners define the concept. This phrase appears nowhere in the state constitutional provisions governing redistricting of the House, Part II, Articles 9, 11, and 11-a. Had the framers of the State Constitution and its amendments wished, "they could have proposed such things as defining and preserving communities of interest," or requiring that legislative districts be compact. *Matter of Legislative Redistricting*, 805 A.2d 292, 297 (Md. 2002). "And had the people agreed, those factors would have become the constitutional guideposts." *Id*. But, they are not.

 Moreover, "[a]lthough preservation of communities of interest [may be] a legitimate redistricting *goal* and is often used to justify the creation of a district that otherwise appears improper, that this is a legitimate *goal* does not mean that there is an individual constitutional *right* to have one's particular community of interest contained within one [legislative] district." *Gorrell v. O'Malley*, Civil No. WDQ-11-2975, 2012 WL 226919, at *3 (D. Md. Jan. 19, 2012) (quotation omitted); *see Graham v. Thornburgh*, 207 F. Supp. 2d 1280, 1296 (D. Kan. 2002). Thus, even if we accept as true the Manchester petitioners' contention that the Plan divides communities of interest, this, at most, raises a question about "the wisdom of the plan." *Gorrell*, 2012 WL 226919, at *4. It does not call into question its constitutionality. *Id*.

*VI. Conclusion*

Accordingly, because the petitioners have not met their burden of proving that the Plan violates the State Constitution, they are not entitled to the declaration they seek.

*Remanded.*

DALIANIS, C.J., and HICKS, CONBOY and LYNN, JJ., concurred.

## Appendix A[1]

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Belknap 1** <br> Center Harbor: 1,096 <br> New Hampton: 2,165 | 1 | 3,261 | -0.9% |
| **Belknap 2** <br> Gilford: 7,126 <br> Meredith: 6,241 | 4 | 13,367 | +1.5% |
| **Belknap 3** <br> Laconia (all wards) | 4 | 15,951 | +3.5% |
| **Belknap 4** <br> Sanbornton: 2,966 <br> Tilton: 3,567 | 2 | 6,533 | -0.7% |
| **Belknap 5** <br> Alton: 5,250 <br> Gilmanton: 3,777 | 2 | 9,027 | +3.0% |
| **Belknap 6** <br> Belmont | 2 | 7,356 | -3.5% |
| **Belknap 7** <br> Barnstead | 1 | 4,593 | +4.4% |
| **Belknap 8 Floterial** <br> Alton, Gilmanton, Barnstead | 1 | 13,620 | INCLUDED IN DEVIATIONS for Belknap 5 and 7 |
| **Belknap 9 Floterial** <br> Belmont, Laconia (all wards) | 1 | 23,307 | INCLUDED IN DEVIATIONS for Belknap 3 and 6 |
| **Carroll 1** <br> Bartlett: 2,788 <br> Hart's Location: 41 <br> Jackson: 816 | 1 | 3,645 | **-4.9% (highest negative)** |
| **Carroll 2** <br> Chatham: 337 <br> Conway: 10,115 <br> Eaton: 393 <br> Hale's Location: 120 | 3 | 10,965 | -4.6% |

[1] This chart was compiled by the court based upon Laws 2012, chapter 9 and the maps of the districts it created, which were included in the appendix to the interlocutory transfer statement.

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Carroll 3** Albany: 735 Freedom: 1,489 Madison: 2,502 Tamworth: 2,856 | 2 | 7,582 | -1.6% |
| **Carroll 4** Moultonborough: 4,044 Sandwich: 1,326 Tuftonboro: 2,387 | 2 | 7,757 | -1.8% |
| **Carroll 5** Brookfield: 712 Effingham: 1,465 Ossipee: 4,345 Wakefield: 5,078 | 3 | 11,600 | -2.1% |
| **Carroll 6** Wolfeboro | 2 | 6,269 | -4.8% |
| **Carroll 7 Floterial** Albany, Bartlett, Chatham, Conway, Eaton, Freedom, Hale's Location, Hart's Location, Jackson, Madison, Tamworth | 1 | 22,192 | INCLUDED IN DEVIATIONS FOR Carroll 1, 2, and 3 |
| **Carroll 8 Floterial** Brookfield, Effingham, Moultonborough, Ossipee, Sandwich, Tuftonboro, Wakefield | 1 | 19,357 | INCLUDED IN DEVIATIONS FOR Carroll 4 and 5 |
| **Cheshire 1** Walpole: 3,734 Westmoreland: 1,874 Chesterfield: 3,604 Hinsdale: 4,046 | 4 | 13,258 | +0.7% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Cheshire 2**<br>Alstead: 1,937<br>Surry: 732<br>Marlow: 742 | 1 | 3,411 | +3.6% |
| **Cheshire 3**<br>Stoddard: 1,232<br>Sullivan: 677<br>Nelson: 729<br>Gilsum: 813 | 1 | 3,451 | +4.9% |
| **Cheshire 4**<br>Keene Ward 1 | 1 | 4,791 | +3.3% |
| **Cheshire 5**<br>Keene Ward 2 | 1 | 4,699 | +1.9 |
| **Cheshire 6**<br>Keene Ward 3 | 1 | 4,681 | +1.6% |
| **Cheshire 7**<br>Keene Ward 4 | 1 | 4,616 | +.6% |
| **Cheshire 8**<br>Keene Ward 5 | 1 | 4,622 | +.7% |
| **Cheshire 9**<br>Roxbury: 229<br>Harrisville: 961<br>Dublin: 1,597<br>Jaffrey: 5,457 | 2 | 8,244 | +0.4% |
| **Cheshire 10**<br>Marlborough: 2,063<br>Troy: 2,145 | 1 | 4,208 | +2.4% |
| **Cheshire 11**<br>Fitzwilliam: 2,396<br>Rindge: 6,014 | 2 | 8,410 | +2.0% |
| **Cheshire 12**<br>Richmond: 1,155<br>Swanzey: 7,230 | 2 | 8,385 | +2.1% |
| **Cheshire 13**<br>Winchester | 1 | 4,341 | +5.0% (highest positive) |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Cheshire 14 Floterial** Dublin, Fitzwilliam, Harrisville, Jaffrey, Rindge, Roxbury | 1 | 16,654 | INCLUDED IN DEVIATIONS FOR Cheshire 9 and 11 |
| **Cheshire 15 Floterial** Swanzey, Richmond, Marlborough, Troy | 1 | 16,934 | INCLUDED IN DEVIATIONS FOR Cheshire 10 and 12 |
| **Cheshire 16 Floterial** Keene Wards 1-5 | 2 | 23,409 | INCLUDED IN DEVIATIONS FOR Cheshire 4-8 |
| **Coos 1** Atkinson & Gilmanton Academy Grant: 0 Cambridge: 8 Clarksville: 265 Colebrook: 2,301 Columbia: 757 Dix's Grant: 1 Dixville: 12 Errol: 291 Erving's Location: 0 Millsfield: 23 Odell: 4 Pittsburg: 869 Second College Grant: 0 Stewartstown: 1,004 Stratford: 746 Wentworth's Location: 33 | 2 | 6,314 | -4.1% |
| **Coos 2** Northumberland: 2,288 Stark: 556 Dummer: 304 Milan: 1,337 | 1 | 4,485 | +2.2% |
| **Coos 3** Berlin | 3 | 10,051 | +1.8% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Coos 4**<br>Lancaster: 3,507<br>Dalton: 979<br>Kilkenny: 0 | 1 | 4,486 | +2.2% |
| **Coos 5**<br>Whitefield: 2,306<br>Jefferson: 1,107<br>Randolph: 310<br>Carroll: 763 | 1 | 4,486 | +2.2% |
| **Coos 6**<br>Success: 0<br>Gorham: 2,848<br>Shelburne: 372<br>Martin's Location: 0<br>Low and Burbank's Grant: 0<br>Meserve's Location: 0<br>Green's Grant: 1<br>Bean's Purchase: 0<br>Crawford's Purchase: 0<br>Chandler's Purchase: 0<br>Pinkham's Grant: 9<br>Bean's Grant: 0<br>Cutt's Grant: 0<br>Sargent's Purchase: 3<br>Hadley's Purchase: 0 | 1 | 3,233 | -1.8% |
| **Coos 7 Floterial**<br>Dalton, Lancaster, Kilkenny, Whitefield, Jefferson, Randolph, Carroll, Dummer, Milan, Stark, Northumberland | 1 | 13,457 | INCLUDED IN DEVIATIONS FOR Coos 2, 4 and 5 |
| **Grafton 1**<br>Bethlehem: 2,526<br>Littleton: 5,928 | 2 | 8,454 | -3.0% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Grafton 2**<br>Monroe: 788<br>Lyman: 533<br>Lisbon: 1,595<br>Sugar Hill: 563<br>Franconia: 1,104 | 1 | 4,583 | +3.0% |
| **Grafton 3**<br>Orford: 1,237<br>Piermont: 790<br>Warren: 904<br>Benton: 364<br>Easton: 254<br>Landaff: 415<br>Bath: 1,077 | 1 | 5,041 | +0.9% |
| **Grafton 4**<br>Haverhill | 1 | 4,697 | -3.7% |
| **Grafton 5**<br>Woodstock: 1,374<br>Lincoln: 1,662<br>Livermore: 0<br>Waterville Valley: 247 | 1 | 3,283 | -0.2% |
| **Grafton 6**<br>Thornton: 2,490<br>Ellsworth: 83<br>Groton: 593<br>Orange: 331<br>Rumney: 1,480 | 1 | 4,977 | +1.5% |
| **Grafton 7**<br>Campton | 1 | 3,333 | +1.3% |
| **Grafton 8**<br>Plymouth: 6,990<br>Holderness: 2,108<br>Hebron: 602 | 3 | 9,700 | -1.8% |
| **Grafton 9**<br>Ashland: 2,076<br>Bridgewater: 1,083<br>Bristol: 3,054<br>Alexandria: 1,613<br>Grafton: 1,340 | 2 | 9,166 | +4.4% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Grafton 10**<br>Enfield: | 1 | 4,582 | +4.4% |
| **Grafton 11**<br>Canaan: 3,909<br>Dorchester: 355<br>Wentworth: 911 | 1 | 5,175 | +4.1% |
| **Grafton 12**<br>Lyme: 1,716<br>Hanover: 11,260 | 4 | 12,976 | -1.4% |
| **Grafton 13**<br>Lebanon Wards 1-3 | 4 | 13,151 | -0.1% |
| **Grafton 14 Floterial**<br>Littleton, Bethlehem,<br>Monroe, Lyman,<br>Lisbon, Sugar Hill,<br>Franconia | 1 | 13,037 | INCLUDED IN DEVIATIONS FOR<br>Grafton 1 and 2 |
| **Grafton 15 Floterial**<br>Bath, Landaff,<br>Easton, Benton,<br>Warren, Piermont,<br>Orford, Haverhill | 1 | 9,738 | INCLUDED IN DEVIATIONS FOR<br>Grafton 3 and 4 |
| **Grafton 16 Floterial**<br>Canaan, Dorchester,<br>Wentworth, Rumney,<br>Thornton, Ellsworth,<br>Groton, Orange | 1 | 10,152 | INCLUDED IN DEVIATIONS FOR<br>Grafton 6 and 11 |
| **Grafton 17 Floterial**<br>Enfield, Grafton,<br>Alexandria, Bristol,<br>Bridgewater, Ashland | 1 | 13,748 | INCLUDED IN DEVIATIONS FOR<br>Grafton 9 and 10 |
| **Hillsborough 1**<br>Antrim: 2,637<br>Hillsborough: 6,011<br>Windsor: 224 | 2 | 8,872 | -3.0% |
| **Hillsborough 2**<br>Deering: 1,912<br>Weare: 8,785 | 3 | 10,697 | -3.8% |
| **Hillsborough 3**<br>Bennington: 1,476<br>Greenfield: 1,749<br>Hancock: 1,654 | 1 | 4,879 | +3.8% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Hillsborough 4** <br> Francestown: 1,562 <br> Greenville: 2,105 <br> Lyndeborough: 1,683 <br> Wilton: 3,677 | 2 | 9,027 | -1.8% |
| **Hillsborough 5** <br> Mont Vernon: 2,409 <br> New Boston: 5,321 | 2 | 7,730 | +4.2% |
| **Hillsborough 6** <br> Goffstown | 5 | 17,651 | -4.6% |
| **Hillsborough 7** <br> Bedford | 6 | 21,203 | -3.2% |
| **Hillsborough 8** <br> Manchester Ward 1 | 2 | 9,121 | +4.0% |
| **Hillsborough 9** <br> Manchester Ward 2 | 2 | 9,219 | +4.8% |
| **Hillsborough 10** <br> Manchester Ward 3 | 2 | 9,113 | +3.9% |
| **Hillsborough 11** <br> Manchester Ward 4 | 2 | 9,115 | +1% |
| **Hillsborough 12** <br> Manchester Ward 5 | 2 | 9,250 | +2.1% |
| **Hillsborough 13** <br> Manchester Ward 6 | 2 | 9,260 | +2.1% |
| **Hillsborough 14** <br> Manchester Ward 7 | 2 | 9,178 | +1.5% |
| **Hillsborough 15** <br> Manchester Ward 8 | 2 | 9,135 | +3.3% |
| **Hillsborough 16** <br> Manchester Ward 9 | 2 | 9,169 | +3.6% |
| **Hillsborough 17** <br> Manchester Ward 10 | 2 | 9,012 | +2.7% |
| **Hillsborough 18** <br> Manchester Ward 11 | 2 | 8,991 | +2.5% |
| **Hillsborough 19** <br> Manchester Ward 12 | 2 | 9,002 | +2.6% |
| **Hillsborough 20** <br> Litchfield | 2 | 8,271 | -4.2% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Hillsborough 21** Merrimack | 8 | 25,494 | -3.2% |
| **Hillsborough 22** Amherst | 3 | 11,201 | +1.7% |
| **Hillsborough 23** Milford | 4 | 15,115 | +2.2% |
| **Hillsborough 24** Peterborough | 2 | 6,284 | -4.5% |
| **Hillsborough 25** Temple: 1,366 Sharon: 352 New Ipswich: 5,099 | 2 | 6,817 | +3.6% |
| **Hillsborough 26** Mason: 1,382 Brookline: 4,991 | 2 | 6,373 | -3.2% |
| **Hillsborough 27** Hollis | 2 | 7,684 | +3.7% |
| **Hillsborough 28** Nashua Ward 1 | 3 | 9,773 | -1.0% |
| **Hillsborough 29** Nashua Ward 2 | 3 | 9,477 | -4.0% |
| **Hillsborough 30** Nashua Ward 3 | 3 | 9,448 | -4.3% |
| **Hillsborough 31** Nashua Ward 4 | 3 | 9,718 | -1.6% |
| **Hillsborough 32** Nashua Ward 5 | 3 | 9,605 | -2.7% |
| **Hillsborough 33** Nashua Ward 6 | 3 | 9,614 | -2.6% |
| **Hillsborough 34** Nashua Ward 7 | 3 | 9,637 | -2.4% |
| **Hillsborough 35** Nashua Ward 8 | 3 | 9,661 | -2.2% |
| **Hillsborough 36** Nashua Ward 9 | 3 | 9,561 | -3.2% |
| **Hillsborough 37** Hudson: 24,467 Pelham: 12,897 | 11 | 37,364 | +3.2% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Hillsborough 38** **Floterial** Antrim, Greenville, Windsor, Hillsborough, Bennington, Hancock, Greenfield, Francestown, Lyndeborough, Wilton | 2 | 22,778 | INCLUDED IN DEVIATIONS FOR Hillsborough 1, 3, and 4 |
| **Hillsborough 39** **Floterial** Deering, Weare, Goffstown | 1 | 28,348 | INCLUDED IN DEVIATIONS FOR Hillsborough 2 and 6 |
| **Hillsborough 40** **Floterial** Hollis, Milford, Mont Vernon, New Boston | 1 | 30,529 | INCLUDED IN DEVIATIONS FOR Hillsborough 5, 22, and 23 |
| **Hillsborough 41** **Floterial** Amherst, Bedford | 1 | 32,404 | INCLUDED IN DEVIATIONS FOR Hillsborough 7 and 22 |
| **Hillsborough 42** **Floterial** Manchester Wards 1-3 | 2 | 27,453 | INCLUDED IN DEVIATIONS FOR Hillsborough 8-10 |
| **Hillsborough 43** **Floterial** Manchester Wards 4-7 | 3 | 36,803 | INCLUDED IN DEVIATIONS FOR Hillsborough 11-14 |
| **Hillsborough 44** **Floterial** Manchester Wards 8-9, Litchfield | 2 | 26,575 | INCLUDED IN DEVIATIONS FOR Hillsborough 15, 16 and 20 |
| **Hillsborough 45** **Floterial** Manchester Wards 10-12 | 2 | 27,005 | INCLUDED IN DEVIATIONS FOR Hillsborough 17-19 |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Merrimack 1**<br>Andover: 2,371<br>Danbury: 1,164<br>Salisbury: 1,382 | 1 | 4,917 | -1.1% |
| **Merrimack 2**<br>Franklin Ward 1: 2,935<br>Franklin Ward 2: 2,611<br>Hill: 1,089 | 2 | 6,635 | +0.8% |
| **Merrimack 3**<br>Franklin Ward 3: 2,931<br>Northfield: 4,829 | 2 | 7,760 | -1.8% |
| **Merrimack 4**<br>Sutton: 1,837<br>Wilmot: 1,358 | 1 | 3,195 | -2.9% |
| **Merrimack 5**<br>New London: 4,397<br>Newbury: 2,072 | 2 | 6,469 | -1.7% |
| **Merrimack 6**<br>Bradford: 1,650<br>Henniker: 4,836 | 2 | 6,486 | -1.5% |
| **Merrimack 7**<br>Warner: 2,833<br>Webster: 1,872 | 1 | 4,705 | -4.0% |
| **Merrimack 8**<br>Boscawen: 3,965 | 1 | 3,965 | 0.0% |
| **Merrimack 9**<br>Canterbury: 2,352<br>Loudon: 5,317 | 2 | 7,669 | -2.7% |
| **Merrimack 10**<br>Concord Ward 5: 4,077<br>Hopkinton: 5,589 | 3 | 9,666 | -2.1% |
| **Merrimack 11**<br>Concord Ward 1 | 1 | 4,465 | +0.7% |
| **Merrimack 12**<br>Concord Ward 2 | 1 | 4,381 | -0.7% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Merrimack 13** Concord Ward 3 | 1 | 4,328 | -1.6% |
| **Merrimack 14** Concord Ward 4 | 1 | 4,137 | -4.9% |
| **Merrimack 15** Concord Ward 6 | 1 | 4,165 | -4.4% |
| **Merrimack 16** Concord Ward 7 | 1 | 4,251 | -2.9% |
| **Merrimack 17** Concord Ward 8 | 1 | 4,141 | -4.8% |
| **Merrimack 18** Concord Ward 9 | 1 | 4,342 | -1.3% |
| **Merrimack 19** Concord Ward 10 | 1 | 4,408 | -0.2% |
| **Merrimack 20** Chichester: 2,523 Pembroke: 7,115 | 3 | 9,638 | -2.4% |
| **Merrimack 21** Pittsfield: 4,106 Epsom: 4,566 | 2 | 8,672 | -1.2% |
| **Merrimack 22** Allenstown | 1 | 4,322 | -1.5% |
| **Merrimack 23** Bow: 7,519 Dunbarton: 2,758 | 3 | 10,277 | +4.1% |
| **Merrimack 24** Hooksett | 4 | 13,451 | +2.2% |
| **Merrimack 25 Floterial** Danbury, Andover, Salisbury, Webster, Warner | 1 | 9,622 | INCLUDED IN DEVIATIONS FOR Merrimack 1, 7 |
| **Merrimack 26 Floterial** Boscawen, Canterbury, Franklin Ward 3, Loudon, Northfield | 1 | 19,394 | INCLUDED IN DEVIATIONS FOR Merrimack 3, 8, 9 |
| **Merrimack 27 Floterial** Concord Wards 1-4, 6-7 | 2 | 25,727 | INCLUDED IN DEVIATIONS FOR Merrimack 11-16 |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Merrimack 28 Floterial** Concord Wards 8-10 | 1 | 12,891 | INCLUDED IN DEVIATIONS FOR Merrimack 17-19 |
| **Merrimack 29 Floterial** Allenstown, Epsom, Pittsfield | 1 | 12,994 | INCLUDED IN DEVIATIONS FOR Merrimack 21, 22 |
| **Rockingham 1** Northwood | 1 | 4,241 | +3.4% |
| **Rockingham 2** Deerfield: 4,280 Nottingham: 4,785 Candia: 3,909 | 3 | 12,974 | +5.0% |
| **Rockingham 3** Raymond | 3 | 10,138 | +2.7% |
| **Rockingham 4** Auburn: 4,953 Chester: 4,768 Sandown: 5,986 | 5 | 15,707 | -4.6% |
| **Rockingham 5** Londonderry | 7 | 24,129 | +4.7% |
| **Rockingham 6** Derry | 10 | 33,109 | +0.6% |
| **Rockingham 7** Windham | 4 | 13,592 | +3.2% |
| **Rockingham 8** Salem | 9 | 28,776 | -2.9% |
| **Rockingham 9** Epping | 2 | 6,411 | -2.6% |
| **Rockingham 10** Fremont | 1 | 4,283 | -1.8% |
| **Rockingham 11** Brentwood | 1 | 4,486 | +1.6% |
| **Rockingham 12** Danville | 1 | 4,387 | 0.0% |
| **Rockingham 13** Kingston: 6,025 Hampstead: 8,523 | 4 | 14,548 | -1.8% |
| **Rockingham 14** Atkinson: 6,751 Plaistow: 7,609 | 4 | 14,360 | -3.0% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Rockingham 15** Newton | 1 | 4,603 | -4.5% |
| **Rockingham 16** East Kingston: 2,357 Kensington: 2,124 South Hampton: 814 | 1 | 5,295 | +4.8% |
| **Rockingham 17** Newmarket: 8,936 Newfields: 1,680 | 3 | 10,616 | -3.1% |
| **Rockingham 18** Exeter | 4 | 14,306 | -2.2% |
| **Rockingham 19** Stratham | 2 | 7,255 | -0.9% |
| **Rockingham 20** Hampton Falls: 2,236 Seabrook: 8,693 | 3 | 10,929 | -3.0% |
| **Rockingham 21** Hampton | 4 | 14,976 | -0.6% |
| **Rockingham 22** North Hampton | 1 | 4,301 | -2.0% |
| **Rockingham 23** Newington: 753 Greenland: 3,549 | 1 | 4,302 | -2.0% |
| **Rockingham 24** Rye: 5,298 New Castle: 968 | 2 | 6,266 | -4.8% |
| **Rockingham 25** Portsmouth Ward 1 | 1 | 4,257 | +3.4% |
| **Rockingham 26** Portsmouth Ward 2 | 1 | 4,321 | +4.6% |
| **Rockingham 27** Portsmouth Ward 3 | 1 | 4,296 | -2.1% |
| **Rockingham 28** Portsmouth Ward 4 | 1 | 4,214 | +2.5% |
| **Rockingham 29** Portsmouth Ward 5 | 1 | 4,145 | +1.2% |
| **Rockingham 30 Floterial** Portsmouth Wards 1, 2, 4 and 5 | 1 | 16,937 | INCLUDED IN DEVIATIONS FOR Rockingham 25, 26, 28 and 29 |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Rockingham 31 Floterial** Newington, Greenland, North Hampton, Portsmouth Ward 3 | 1 | 12,899 | INCLUDED IN DEVIATIONS FOR Rockingham 22, 23 |
| **Rockingham 32 Floterial** Candia, Deerfield, Northwood, Nottingham | 1 | 17,215 | INCLUDED IN DEVIATIONS FOR Rockingham 1, 2 |
| **Rockingham 33 Floterial** Brentwood, Fremont, Danville | 1 | 13,156 | INCLUDED IN DEVIATIONS FOR Rockingham 10-12 |
| **Rockingham 34 Floterial** Atkinson, Plaistow, Hampstead, Kingston | 1 | 28,908 | INCLUDED IN DEVIATIONS FOR Rockingham 13, 14 |
| **Rockingham 35 Floterial** East Kingston, Kensington, Newton, South Hampton | 1 | 9,898 | INCLUDED IN DEVIATIONS FOR Rockingham 15, 16 |
| **Rockingham 36 Floterial** Exeter, Newfields, Newmarket, Stratham | 1 | 32,177 | INCLUDED IN DEVIATIONS FOR Rockingham 17, 18 |
| **Rockingham 37 Floterial** Hampton, Hampton Falls, Seabrook | 1 | 25,905 | INCLUDED IN DEVIATIONS FOR Rockingham 20, 21 |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Strafford 1**<br>Middleton: 1,783<br>Milton: 4,598 | 2 | 6,381 | -3.1% |
| **Strafford 2**<br>Farmington | 2 | 6,786 | +3.1% |
| **Strafford 3**<br>New Durham: 2,638<br>Strafford: 3,991 | 2 | 6,629 | +0.7% |
| **Strafford 4**<br>Barrington | 2 | 8,576 | -2.2% |
| **Strafford 5**<br>Lee | 1 | 4,330 | -1.5% |
| **Strafford 6**<br>Madbury: 1,771<br>Durham: 14,638 | 5 | 16,409 | -0.3% |
| **Strafford 7**<br>Rochester Ward 1 | 1 | 4,995 | +1.2% |
| **Strafford 8**<br>Rochester Ward 6 | 1 | 5,014 | +1.5% |
| **Strafford 9**<br>Rochester Ward 2 | 1 | 5,030 | +1.5% |
| **Strafford 10**<br>Rochester Ward 3 | 1 | 4,911 | -0.1% |
| **Strafford 11**<br>Rochester Ward 4 | 1 | 4,905 | -0.7% |
| **Strafford 12**<br>Rochester Ward 5 | 1 | 4,897 | -0.8% |
| **Strafford 13**<br>Dover Ward 1 | 1 | 4,991 | +1.4% |
| **Strafford 14**<br>Dover Ward 2 | 1 | 5,074 | +2.5% |
| **Strafford 15**<br>Dover Ward 3 | 1 | 5,028 | +2.2% |
| **Strafford 16**<br>Dover Ward 4 | 1 | 5,134 | +3.6% |
| **Strafford 17**<br>Dover Ward 5<br>Dover Ward 6<br>Somersworth Ward 2 | 3 | 12,075 | +4.8% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Strafford 18**<br>Somersworth Ward 1: 2,496<br>Somersworth Ward 3: 2,527<br>Somersworth Ward 4: 2,353<br>Somersworth Ward 5: 2,075<br>Rollinsford: 2,527 | 3 | 11,978 | +4.0% |
| **Strafford 19 Floterial**<br>Dover Wards 1 and 2 | 1 | 10,065 | INCLUDED IN DEVIATIONS FOR Strafford 13 and 14 |
| **Strafford 20 Floterial**<br>Dover Wards 3 and 4 | 1 | 10,162 | INCLUDED IN DEVIATIONS FOR Strafford 15 and 16 |
| **Strafford 21 Floterial**<br>Dover Wards 5 and 6,<br>Somersworth Wards 1-5,<br>Rollinsford | 1 | 24,053 | INCLUDED IN DEVIATIONS FOR Strafford 17 and 18 |
| **Strafford 22 Floterial**<br>Rochester Wards 1-6 | 1 | 10,009 | INCLUDED IN DEVIATIONS FOR Strafford 7 and 8 |
| **Strafford 23 Floterial**<br>Rochester Wards 2 and 3 | 1 | 9,941 | INCLUDED IN DEVIATIONS FOR Strafford 9 and 10 |
| **Strafford 24 Floterial**<br>Rochester Wards 4 and 5 | 1 | 9,802 | INCLUDED IN DEVIATIONS FOR Strafford 11 and 12 |
| **Strafford 25 Floterial**<br>Barrington, Lee | 1 | 12,906 | INCLUDED IN DEVIATIONS FOR Strafford 4 and 5 |
| **Sullivan 1**<br>Cornish: 1,640<br>Plainfield: 2,364<br>Grantham: 2,985<br>Springfield: 1,311 | 2 | 8,300 | +5.0% |

| District | Seats | Total Population | Deviation |
|---|---|---|---|
| **Sullivan 2**<br>Croydon: 764<br>Sunapee: 3,365 | 1 | 4,129 | +4.5% |
| **Sullivan 3**<br>Claremont Ward 1 | 1 | 4,598 | +3.9% |
| **Sullivan 4**<br>Claremont Ward 2 | 1 | 4,490 | +2.1% |
| **Sullivan 5**<br>Claremont Ward 3 | 1 | 4,267 | -1.7% |
| **Sullivan 6**<br>Newport: 6,507<br>Unity: 1,671 | 2 | 8,178 | +3.7% |
| **Sullivan 7**<br>Langdon: 688<br>Acworth: 891<br>Lempster: 1,154<br>Goshen: 810<br>Washington: 1,123 | 1 | 4,666 | -4.0% |
| **Sullivan 8**<br>Charlestown | 1 | 5,114 | +2.0% |
| **Sullivan 9 Floterial**<br>Cornish, Croydon, Grantham, Newport, Plainfield, Springfield, Sunapee, Unity | 1 | 20,607 | INCLUDED IN DEVIATIONS FOR Sullivan 1 and 2 |
| **Sullivan 10 Floterial**<br>Claremont Wards 1-3 | 1 | 13,355 | INCLUDED IN DEVIATIONS FOR Sullivan 3-5 |
| **Sullivan 11 Floterial**<br>Acworth, Charlestown, Goshen, Langdon, Lempster, Washington | 1 | 9,780 | INCLUDED IN DEVIATIONS FOR Strafford 7 and 8 |

Overall Range of Deviation is -4.9% - +5.0% = 9.9% (ignoring algebraic symbols)